Hold on, hold on just a minute, let this circle get out. Hold on, hold on just a minute, let this circle get out. All right, Mr. Cameron, you can proceed. Thank you, Your Honor. May it please the Court, of the two issues raised in this appeal, the constitutionality of the Railway Labor Act's provision requiring compulsory union fees and the question of whether or not my clients must affirmatively object, that is the nonmembers, to prevent their money from being defaulted into the union's political coffers, I intend to discuss the second issue first, the affirmative objection issue first, and if I have time, I'll go to the issue of the constitutionality of compulsory union fees. The trial court was understandably concerned about binding precedent, I assume this court is to some degree. We believe that this court is bound by precedent, but the precedent that binds this court, and the only precedent that binds this court, is that this court must apply the highest level of constitutional scrutiny, exacting scrutiny, to the union's actions here. So basically, the test is now strict scrutiny, and if we apply strict scrutiny, you win. That's exactly the battle plan, Your Honor. And the reason why that's appropriate is that in 2012, for the very first time, the United States agency fee cases, that exacting scrutiny is required. Two years later, in 2014, the United States Supreme Court, again in the Harris case, reaffirmed that exacting scrutiny is required. Now this is in contradistinction to the precedents relied upon by our litigation opponents. They rely upon the 1956 Hansen case that applied only a rational relationship test to defeat the First and Fifth Amendment claims by the plaintiff employees in that case. And they also relied upon the 1977 Abood v. Detroit Board of Education case, which applied only an intermediate level of scrutiny to defeat part of the plaintiff employees' claims in that case. Do we need to wait for Friedrichs, or to see if Abood is overruled, is that dispositive in this case? I'm going to ask the opposing counsel that, too. Do I think you should wait on Friedrichs? The answer is, yes, I do. And I will tell you, Friedrichs has two issues before, as this case has two issues. I'm sorry that Friedrichs beat us to the Supreme Court, but they did. And their issue, the one I'm arguing right now, does it violate the First Amendment rights of non-members to have their money defaulted into the union's political coverage, is identical. And as you know, in June of this year, the U.S. Supreme Court granted certiorari in Friedrichs. It should be argued in January or February, and, of course, the decision should come out by June. I believe that absolutely controls the decision here, if the Supreme Court accepts the argument I'm making to this Court. Does it control if there's not a state action? Is there an issue with it that it might not control? Well, if there is no state action, of course, I would agree we don't have a First Amendment claim. The Supreme Court has never varied from the idea that there's state action under the Railway Labor Act, particularly when it comes to compulsory union fees. You see, unlike the National Labor Relations Act, which allows states to opt out of compulsory union fee agreements, the Railway Labor Act absolutely preempts any state right-to-work law, and so the United States Supreme Court has said for that reason there's state action. I would suggest to you the larger regulatory purpose in which the entire matter of labor relations is controlled by government sanction gives us state action. You see, the union dues dollar here, if I may continue on, have I sufficiently answered? Yes, you have. Please, you can get back to your road map. The union dues dollar has two components, the part that reflects the political and ideological expenses of the union, and the part that reflects the collective bargaining expenses of the union. The law is undisputed that my clients own title to the political and ideological portion of the union dues dollar. They have a constitutional right to it. That is Knox at page 2295, whereas the union's title to the collective bargaining cost is only a matter of contract and statute. My clients paid very dearly for that portion of the dues dollar that represents the political and ideological cost, because when they resigned for their union membership, the union barred them from having any voice or vote in the workplace conditions. They cannot work on the collective—they cannot vote on the collective bargaining agreement. They cannot attend union meetings and voice concerns they might have about problems in their workplace. You said after they resign? That's right. Once you're a non-member, the union bars you completely from any voice or vote in your workplace conditions. And so this decision to be a union member—to be—resign from being a union member and be a non-member is a very serious decision when it comes to your workplace conditions. Why isn't it that the fact of resignation alone would be seen as an opt-out? Well, Your Honor, that's exactly— Why can't it just be in the same letter? You know, I resign my membership and don't ever use my dues. Why isn't it the same document? Why do you have to actually physically opt out afterward? Or is that not factually what happens? Well, they do—they do not have a nice, simple form saying opt out and, by the way, I don't want to pay the union dues dollar. But I agree with the premise of your question, which is, if you've decided to be a non-member, if you have forgone any right to have a voice and a vote in your workplace conditions, then clearly you should be able to say, I am not supporting the union, simply by your non-membership. Now, of course, this also raises the First Amendment issue, which is the other part of the argument, but let me go to that right now because I want to satisfy your question. The issue is the constitutional right not to speak. If you're a non-member, then you have a right not to speak in the tongue of the union with regard to its political and ideological issues. How incongruous it would be to say, I have to speak up in order not to speak. And so we believe that the non-member, simply because of their status as a non-member, cannot be compelled to pay the union fees. Have your clients opted out or they have not opted? What is, where's the positive? This is a class action with class representatives. All the class representatives have opted out. The class is a class of all the non-members represented by TWU and those that may become non-members in the future. So this is on behalf of individuals in the class who have simply said, we're not members of the union. But they filed their one letter that says, we don't want our money used anymore. Well. And it's a one-time thing and does it matter if it's annually or if it's one time? The union, after we filed the lawsuit, stopped its annual objection requirements. And so that part of our complaint is not at issue here. The union only requires one objection, but we believe one objection is too much. You see, if you agree with us. Is that some sort of victory that you've had already or that they've changed their policy and that's already been taken care of? The union said, your third count is now mooted because we have decided we're not going to require annual objections. You see, the second part, you're going to follow up on this issue of whether or not non-members must affirmatively object. The second part of the highest level of constitutional scrutiny is narrow tailoring, which is that this court must minimize the risk that my client's money will be used for political and ideological purposes. Now, with regard to that issue, this court is very hemmed in by the facts of this case. We are the only ones that put in any evidence about the question of risk of the choice structure used by the union in this case. We put in the declaration, Dr. John Balls, a renowned expert in this area of choice architecture. And Dr. Balls said that as a matter of science, the conclusion, and a conclusion which I think you would reach intuitively, is that if you default someone into a certain result, as the individual will take the choice that they're defaulted into. Which is why people make it an opt-out, make everything an opt-out, because people don't go through the trouble. That's exactly right, because this choice architecture science says, hey, if you have to opt out, then there are going to be far fewer. The risk, according to Dr. Balls, is between 100% and 700% based on the studies that he has. And we, of course, have those in the record. But assume that, can we get to the main point? Oh, okay. If we don't, what if we don't believe that we have the right to be ahead of the Supreme Court, like you cited in that case that you said we were ahead of the Supreme Court and patted us on the head for doing so? What if we don't believe that's our role, to be ahead of the Supreme Court? You're not ahead of the Supreme Court. No, I'm just saying, while Hanson, it's really difficult to apply Hanson, because Hanson is using a rational basis standard, and we've been told we have to use strict scrutiny. But if it's on all fours, even though they're using the wrong standard, maybe we shouldn't step out. Well. So that seems to me to be the hardest problem of this case. Let me fix that problem for you, Your Honor. If you were to find that there is a compelling state interest in defaulting my client's money into the union's political coffers, you would be doing something the United States Supreme Court has never done, and you would be leading the Supreme Court on that. And the reason why I say that is in the 1984 Ellis case, the United States Supreme Court said at page 443 that it had never previously passed on the constitutionality of the remedies questions in an agency fee case. This issue about do you have to opt in or opt out is a remedies issue. And then in 2012, the United States Supreme Court essentially reaffirmed that in Knox by saying that it had never previously adequately looked at the constitutionality of affirmative objection. And that is found at page 2290 of the Knox decision. So you would not believe, this court I do not believe is bound by precedent on the affirmative objection. If you take the second prong and you let the first prong, then you think we're not hemmed in. Is that what you're saying? I say you're not hemmed in at all on the affirmative objection issue because the United States Supreme Court has never decided this as a constitutional matter. It is sad, as I'm sure opposing counsel will come up here and say, it said repeatedly the dissent is not to be presumed, but that has only been dicta according to the United States Supreme Court. That started in 1961 in the street case where everyone was a union member and the Supreme Court said looking at a sea of union members, how do we know which union members voluntarily support the union and how many of them are compelled to support the union? So the Supreme Court is just a practical matter, said, well, we require these people who object to raise their hand. But as the Supreme Court said in Ellis, that was not a constitutional decision. As the Supreme Court said in Knox, that was not adequately considered by us with regard to constitutional issues. So I do not believe this court is bounded at all by precedent with regard to the affirmative objection issue, except for having to apply the highest level of constitutional scrutiny. And if you do that, then narrow tailoring absolutely, I believe, positively prevents this court from saying that the choice architecture that maximizes the transfer of my client's money into the union's political coffers is inconsistent with the First Amendment. Now— I think it fails— Does it matter? Excuse me. Does it matter that Knox and Harris are public sector unions with respect to your client being a private sector?  Does that matter? I don't think—for two reasons, Your Honor. First, state action, we're still talking about the same First Amendment. But perhaps more importantly, I believe this court has crossed the Rubicon with regard to that issue in the Shea case. Because in Shea, a Railway Labor Act case involving agency fee procedures, this court relied upon the Supreme Court's decision in Chicago Teachers Local 1 v. Hudson. Hudson is a public employee case. And so, instead of relying upon Hansen, which would be the result if my litigation opponents were arguing Shea, this court relied upon Hudson. And I think that is appropriate. Finally, in the last two minutes, with regard to the question of whether or not compulsory union fees are constitutional, Knox says that there is a two-prong test that's at page 2289. And the second prong is that compulsory fees must be a necessary incident of the larger regulatory purpose. They cannot be a necessary incident under the Railway Labor Act because Section 211, the section that deals with compulsory union fees, makes them permissive. If Congress thought that compulsory union fees were a necessary incident, they would not leave it up to the vagaries of collective bargaining and make it permissive. In addition, if you look at the history of the Railway Labor Act, there was volunteerism before 1934. In 1934, for the first time, they said unions can be the exclusive bargaining representative. And then it was not until 16 years later, in 1951, that unions were allowed to collect compulsory union fees from individuals. Therefore, for 16 years under the Railway Labor Act, there were no compulsory union fees. They were prohibited. They were very rare before that. And so, I think history says it is impossible to say that compulsory union fees are a necessary incident of the larger regulatory purpose. Thank you. Thank you, Mr. Cameron. You've reserved your rebuttal time. Mr. DeSheriff, is that correct? Did I say your name right? Yes, you did. Thank you, Your Honor. Good morning, Your Honors. In this case, the plaintiffs are, in effect, asking this Court to act as if it were the Supreme Court. It's asking this Court to overturn the longstanding decision in Hansen that Section 211 of the Railway Labor Act is constitutional, and it's asking this Court to overturn this Court's decision in the Shea case that the opt-out is consistent with the Constitution. Let me begin by addressing the first claim about whether or not Section 211 of the Railway Labor Act is constitutional. As I said, this Court is bound by the Hansen case. The Hansen case was exactly on point with this case. There were a group of non-union members who argued that their First Amendment rights were being violated by having to pay anything to the union that represented them under the Railway Labor Act, and the United States Supreme Court said, quote, or said that the RLA's and the plaintiffs here are asking this Court to overturn that decision. The Rodriguez decision — That court applied rational basis, didn't it? It did not, Your Honor. It did not apply rational basis, if it applied anything? It certainly didn't apply strict scrutiny. It did not apply strict scrutiny. The Court, I think, if a fair reading of Hansen is the Court does not indicate what level of scrutiny it applies. But it's certainly not applying strict scrutiny. We can agree on that. It did not apply strict scrutiny, but it did say, and here's the important thing, it did say that Section 211 of the Railway Labor Act did not violate the First Amendment. And what the Rodriguez case says, the Supreme Court's Rodriguez case says, is even if there's a Supreme Court case whose doctrinal underpinnings have been called into question, it is the its own precedent. It is not the role — Are you saying the doctrinal underpinnings of Hansen have been called into question? Excuse me, Your Honor? Are you conceding that the doctrinal underpinnings of Hansen have been called into question? Absolutely not, Your Honor. Quite the contrary. I am saying Hansen is more justifiable than ever. Let me just first, before I explain why that is, let me just go to the red herring that the Harris case applied strict scrutiny. You're saying Harris doesn't apply strict scrutiny? Well, let me explain. Harris had two parts. Harris first — well, first, Harris was about a group of unique employees who were personal assistants who worked in the homes of clients who were disabled or elderly people. They were represented by a union that did not have full union functions. It could not negotiate over wages. It could not file grievances. For example, if the customer fired the personal assistant. This issue before the court in Harris was whether or not with that unique set of employees and that unique type of union, those facts fell within what I'll call the Abood paradigm, the union shop paradigm that had been applied in Abood. And what the Supreme Court held in Harris was no, because these workers were so unique and so different, the court would not extend the Abood analysis to this unique group of workers. And it was only once the Supreme Court got outside of that Abood paradigm that the court said, ah-ha, we're now outside of that, now we will apply strict scrutiny. So yes, the answer is yes and no. The answer is yes, the Harris court applied strict scrutiny, but only when it said that this unique group of workers and this unique type of union did not fall within the normal union shop analysis. So it is inaccurate to say when you have a union such as this one, which has the transport workers union, which has full union duties, a full range of statutory duties under the Railway Labor Act to maintain stability in two industries that are vital to this nation, to attempt to avoid labor peace, to bear the ongoing cost of representing and negotiating collective bargaining agreements, administering those agreements. And not only that, and here's the key. I'm sorry, Your Honor. Expenditures are not part of that, though. I'm sorry, Your Honor. You're saying that how necessary and important this all is, but we're also dealing with political expenditures here, aren't we? Well, the law is clear that non-members don't have to pay for non-chargeable expenses, which include political expenses. So that's not an issue. Well, it's an issue of whether they have to opt out or not. Well, that's a separate issue, and I'm happy to get to that if Your Honor would like me to. I was talking about the first issue in the case, which is whether Section 211 of the Railway Labor Act was constitutional. But if— Justice Leito himself limits—Justice Leito limits Harris—I mean, limits Hansen in Harris. Well— Because Hansen doesn't—he does it in one sentence, the constitutionality, and it's not really a constitutional decision, but it's only for the proposition that it is authorized to collect benefits, period. It doesn't extend it to say who it's authorized from, the mechanism, any of that. Well, I would admit that Justice Leito's remarks in Harris— Remarks? It's the holding of the case. I disagree, Your Honor. It's not the holding. It's dictum. And if—and let me explain why it's dictum. Because Justice Kagan said so in the concurrence? Is that the answer to the question? I'm sorry, Your Honor. I said, is that because Justice Kagan said it was? No. Which is very valuable. No, no. As I learned in law school, the holding of the case is you look at what the facts of the case is and how the case came out, and that's the holding, and everything else is dictum. So what was not before the court in Harris, for example, was whether Section 211 of the Railway Labor Act was constitutional. Harris was a public sector case, and in Harris, the court takes pains to explain why the public sector is different from the Railway Labor Act.  What do you do with Shea? Shea stands in opposition to that, though, doesn't it? Because it applies—doesn't apply rational basis in the private sector and cites to the public sector. I'm glad you brought up Shea, Your Honor. Let me address Shea. In Shea, this court, on the second issue of opt-out, held that while it would be unconstitutional for a union to require nonmembers who seek to—who oppose paying nonchargeable expenses to have to renew every year their objections, this court held that a continuing objection, which is exactly what is—is exactly what the Transport Workers Union policy provides for. All the nonmember who objects has to do is send in two one-line letters to the union, and forever thereafter, they never again have to pay any nonchargeable expenses. Are they a prevailing party? If Your Honor may—if I may. No, I'm sorry. I thought you were— No, I'm not at all done. If—in order for—for—and this court, the Fifth Circuit, held in Shea that a provision exactly like the TWU's provision was constitutional. It said, in fact—let me see if I can quickly find the language. It said that the procedure, just like the one the TWU has, where there's a continuing one-time forever objection, quote, this is the Fifth Circuit in Shea, quote, is the procedure that least interferes with an employee's exercise of his First Amendment rights, end quote. So I think Shea—I submit Shea is dispositive of that opt-out provision. This court would—this—if I understand how this court operates, this panel does not have the authority to overrule Shea. Shea is directly on point and holds that opt-outs, when there's a continuing violation, is constitutional. But let me get to, I think, what you're trying to get at, Justice—Judge Elrod. Your question was whether or not—what standard Shea applied, and Shea applied language that said that you have to minimize the violation, and that's in the—that's in the decision, and of course we don't dispute that, but what that showed, the significance of that is even under that standard, where the First Amendment violation has to be minimized, this circuit, the Fifth Circuit, nonetheless held that opt-out, when you have a continuing objection that lasts forever, is the procedure that, quote—I'm quoting the Fifth Circuit again—is the procedure that least interferes with the employee's First Amendment rights. So even under—even if you agree that there has to be some heightened degree of scrutiny, and I admit, as the Fifth Circuit said in Shea, that it's a—you have to minimize the First Amendment violation, even under that standard, we know how the Fifth Circuit ruled, because it—that's how it ruled in Shea. I would also note, there was a long discussion in Shea before the court gets to the opt-out issue, and it talks about the history of whether or not the union shop under the Railway Labor Act, and whether the union shop is constitutional, and there's nary a word by this court, under that exacting standard, that questions whether or not Section 211 is constitutional. So, again, this court is bound by Hansen and by Shea. Hansen on the first issue, Hea on the—by Shea on the second issue. Have you answered my question? If I haven't, Your Honor, I apologize. No, I'm asking because I have the—but I want to let—Judge Clement has a question. Okay, and I apologize if I didn't answer your question. If we're bound by Hansen and Shea, why wouldn't we be bound by the Supreme Court's decision in Friedrichs? And perhaps an administrative stay of this case would benefit the parties in the court, if we're talking about eight months. Can you agree with that? No, Your Honor, I would not agree with that, and that's because— You were nodding your head. What's that? You were nodding your head. I was just following your question. But my answer to your question is, no, there's no need, and I don't think—for this court to wait, and I don't think this court should wait. And the reason is because Friedrichs is a public sector case. At most, Friedrichs will overrule Abood. But in Harris and in Knox, the court said repeatedly that there are significant distinctions between the public sector and the Railway Labor Act. And let me give a couple examples. In the public sector, the distinction between collective bargaining and between political activity is unclear because the person on the other end of that is the government in both cases. In the public sector, you bargain with the government, and you engage in political activity against the government. So that line is blurred. That line is not blurred in the Railway Labor Act case. That's one distinction that the court in Harris and Knox made. Another distinction—and again, this is from the cases that the plaintiffs rely on, Harris and Knox—another distinction is that in the public sector, the government imposes the union shop. In the Railway Labor Act, the legislation authorizes—the phrase used in those cases is bear authorization—but it's private parties, the union and the airline or the union and the railroad, that actually enter into the union shop and administer it. So the state action, while for purposes of this argument I will concede exists, although we reserve that if this case ever gets to the Supreme Court, but to the extent there's state action, it's attenuated. This is not my reasoning. This is the reasoning of Harris and Knox. So assuming the same justices who decided Harris and Knox decide Friedrichs, presumably that rationale is going to apply. So whatever comes out of the court in the Friedrichs case I submit would be distinguishable. And there's no reason for this court not to go forward with this case now. There are plenty of precedents. In fact, we submit dispositive precedents that exist now that allow this court to render a decision. I mean, the way our judicial system works is cases are decided as they come up. The law is always changing. Supreme Court cases are— I mean, that's true, and we acknowledge that. And it's not difficult for us to understand why you make that argument. But on the other hand, you know, it's a high-stakes proposition. The court has spoken to it in a number of cases, whether you call it dicta or otherwise. You know, there's comments in the cases about the general area. I'm not underappreciating the distinction between public and private, but in the grand scheme of things, you know, it's an issue. And so often the cert grant is on a question, but when the opinion comes out, I mean, it ends up dealing with a lot of matters that are in the landscape of things. So, the worst case scenario, coming back to the question Judge Clement asked you, we get it that we do our job and the Supreme Court does its, but, you know, we're not blind to the fact you've got this big ticket case up there and the court may speak to another thing that may inform what may or should happen in this case. And the worst that happens if they distinguish it the way you say, how is it worse off that we didn't apply the precedent that you say is there anyway? On the other hand, if they say something that, you know, does illuminate the matters, I mean, on both sides, the better for that? Well, Your Honor, obviously the court determines the timing of its decision and the court will do what it would. But let me just say one thing that may give the court some comfort. There are organizations, like the organization that funded this lawsuit, who are in the of doing nothing, nothing, but challenging Union Shop. They hammer away relentlessly through their litigation campaigns at the Union Shop. If the Supreme Court comes down with a decision in Friedrichs that they think gives them ammunition to challenge the Union Shop and the Railway Labor Act, they will be filing a complaint the next day. And that case will be heard. So, this court need not worry that whatever comes out of Friedrichs will escape judicial review if it has any bearing on the constitutionality of the Railway Labor Act. Your client has changed its procedures since the filing of this lawsuit, is that correct? That is correct, Your Honor. So, are they already a prevailing party in that they got the procedures changed? That issue was never litigated. That issue never came up. The plaintiffs dropped that issue. Okay, so that's not an issue. Okay. They dropped that issue, so that's not an issue. I don't think that I've asked you the most important question. Okay. And the most important question is, assuming arguendo, that strict scrutiny applies, are you entitled to summary judgment in this case on compelling interest and narrowly tailored? Your Honor, we are entitled to summary judgment. The district court correctly granted us summary judgment because, as the district court itself said, Hansen is dispositive. You're fighting the hypo. Assuming arguendo, that strict scrutiny is the applicable standard that we must apply, have you established your entitlement to judgment as a matter of law under strict scrutiny? Yes, Your Honor, because this court is not writing, and the district court was not writing on a clean slate. Let's assume arguendo. I'll accept the assumption that the law has changed and now strict scrutiny applies. I disagree with that, but let's assume that for the sake of the hypothetical. The district court and the Fifth Circuit are bound to follow the decision of the Supreme Court that says the Railway Labor Act union shop provision is constitutional. It's the prerogative. This is what the Supreme Court has said. It's the prerogative of the Supreme Court to overrule its precedents. It's not the prerogative. I guess I should ask the other question. Have you met the standards for strict scrutiny? That's a separate question. I'm not asking, does the Supreme Court hold for some other reason that you win, which is what you keep saying. My question is, does this record establish as a matter of law compelling state interest and narrowly tailored? Your Honor, I'm not in a position to answer that because that is not what the law is. Strict scrutiny does not apply. Do you understand what a hypo is? I can give you compelling reasons. Let me give you compelling reasons on both points for why, for the union shop. The Railway Labor Act regulates labor relations in two vital industries. It maintains labor peace. If you want to look at what a legal regime looks like where there's no labor peace in the railway and airline industry, take a vacation in France or Italy and try to book a plane ticket or a train ticket for your holiday and find out the railroad workers are on strike or the airline workers are on strike. It happens all the time over there. It does not happen over here because we have a regulatory regime that fosters stability, that charges the union with making and maintaining collective bargaining agreements. It's an expensive and difficult and ongoing proposition. Not only that, but in 1944, well after 1926, just to put the historical timeline in perspective, in 1944 in the Steele case, the United States Supreme Court said not only does the union have that ongoing, expensive, difficult statutory role in maintaining peace in these two vital industries, but it has a legal obligation to promote and defend and preserve the interests of even those workers who choose not to be members. And let me quote Justice Scalia because I think Justice Scalia has some wisdom here. This is his Larnart, his opinion in the Larnart case. Justice Scalia says at 500 U.S. 556, quote, where the state imposes upon the union a duty to deliver services, it may permit the union to demand reimbursement for them. Or looked at from the other end, where the state creates in non-members a legal entitlement from the union, it may compel them to pay the cost, end quote. That's not me. That's Justice Scalia. But we're not dealing with the cost. We're dealing with political expenditures. That's not the same thing. Can you answer the second part of my question? I know your time has expired, but you did not answer narrowly tailored. And your opposing counsel said that they had the only evidence in the record is on their side in narrowly tailored. And so I'm asking you, do you have a summary judgment record that you could win on narrowly tailored? Under any standard, the district court and this court is bound to follow Supreme Court and Fifth Circuit precedent. If I may say, I know my time is up. If I may say one last thing, Your Honors. You fully answered the question at all. I'll give you a moment to make the conclusion, but go ahead and fully answer the question as best you can. I'm trying my best, Your Honor. You asked, I think your question was, even under strict scrutiny, would we win? Would we win on summary judgment? Yes. And I asked you on narrowly tailored. They said the only evidence in the record supports them on narrowly tailored. My answer to your question, Your Honor, is yes, we win because there are compelling compelling government interests that promote the regulatory scheme. And don't just look at Hansen. Hansen has been applied in other cases. Look at the Keller case with bar fees. Look at the student speech case. Look at the case requiring agricultural growers to have to contribute to speech. The Hansen question is an evidentiary question, not whether you're titled to win as a matter of law based on Hansen. The question is, in the summary judgment record, the counsel opposite says they put the only evidence in, narrowly tailored. And the question is an evidentiary one, not a what does Hansen say. So the question is, so is your answer notwithstanding whatever the evidence is, you win? Or is there other evidence that traverses what counsel obvious? It's an evidentiary question, not what the law questions. You got it? Thank you, Your Honor. I appreciate your clarifying that. There are no material facts in dispute in this case. It's not a question of if you put aside the law, are there who wins on the facts? This is not that kind of case. There are no factual disputes. It's true that the plaintiffs brought in a so-called expert who opined about behavioral economics. They put in no studies about how the world operates, no empirical studies about how the world operates under a union shop. Their expert had no experience with labor, with union shops, or anything that's relevant to this case. But to answer Chief Judge Stewart's, your question, there are no factual, material factual disputes in this case. If I may end on one comment. Plaintiffs' counsel said it was incongruous for a nonmember to have to speak up in order not to speak. If you look at the case by the Supreme Court that said Jehovah Witness children don't have to say the Pledge of Allegiance, they have a right not to say the Pledge of Allegiance because of their religious conscience. Does that mean the teacher has to say, okay, who are the volunteers today who want to say the Pledge of Allegiance? She doesn't have to say that. The teacher says, okay, class, now we're going to say the Pledge of Allegiance. It's the burden on those little Jehovah Witness children, whose religious conscience prevents them from saying the Pledge of Allegiance, to object. If those children, in front of their peers and their teacher, can object to not having compelled speech, certainly these nonmembers can write a one-line letter to their union saying, I object. The Barnett sisters were allowed to stand silent, weren't they? Not required to speak up. All right, I'm going to, you, knowledge judge. Were they? I'm asking you about the Barnett sisters that you chose to end on. Were they required to speak up or were they allowed to stand silent? They were allowed to stand silent, but the point is that they had to object. They had to make known at some point that they did not want to say the Pledge of Allegiance. Just like as it's perfectly constitutional for a nonmember who, for whatever reason, doesn't want to pay, and they're not just political expenses, they're charitable expenses. All right, I'm going to shut you now. Thank you. Thank you very much. I think you've responded on the point. I hope you have anyway, but at any event, I'm going to conclude you there. Thank you, Your Honor. And bring back up Mr. Cameron for rebuttal. Thank you for your argument and answers to the questions. Mr. Cameron? Thank you, Your Honor. Opposing counsel is exactly right that the facts in this case are undisputed and they are undisputed with regard to the risk. We alone put in an expert testimony. They put in no expert testimony or testimony of any sort about this. Now, they say that you shouldn't wait for Friedrichs, but you will be interested to know in the trial court, they asked for a stay for the United States Supreme Court to decide the Harris case, a case which they now say has, you know, completely irrelevant to this case. That's at the record page 754 to 755 where they requested a stay. Now, with regard to Shea, they say that Shea binds you, but Shea very clearly said this at page 510. It says the sole issue before this court is whether the annual objection renewal requirement is permissible as applied to written continuing objections. That was the only issue before the court in Shea. The reason why Shea is so important and so favorable to us is because Shea said we must minimize the risk that non-member's money will be used for political and ideological purposes. And so, Shea said if you ask us and you raise as an issue numerous objections, that's not narrow tailoring. Our case is a continuation of Shea because we say we're raising the issue of any objection at all. Not decided in Shea except for the fact that Shea says narrow tailoring is required. And since narrow tailoring is required, that would also logically apply to our suit. It is. Are you, and I don't mean you personally, but your client, an amicus participant in the Fredericks case? I would assume you are. Yes. Yes. As I say, I'm sorry that they beat us there in this case. But yes, Your Honor. All right. Then I kind of figured, tried not to ask questions and not know the answer, but I kind of figured that was the answer. So to follow up to that then, what is the point in that case or points specifically that as amicus you are articulating in the briefing? Is it overruling a boot? Is it these larger efforts? I mean, just give me a capsule of what the posture being taken from your side in that case. Well, we're not doing anything inconsistent, Your Honor. No, no, no. I wasn't suggesting. It's just for information. Actually, in that case, because there are so many amici, what we're doing is we're arguing this issue of labor peace. And so we figured there are many others that will be arguing various issues. We're not arguing specifically the issue here about the affirmative objection. That is because we think that's adequately covered by the parties and other amici. But with regard to this issue of affirmative objection, that is one of the questions on which the United States Supreme Court has granted review. No question— No, no, no. I understand. I'm not trying— It's not a trick question, honestly. It's just illumination. I know that a case with this high stake is going to have umpteen amicus briefs in it. And so, given the reasons you've argued and trying to persuade us that it's likely to say something divine, I'm trying to get a preview. I'm trying to get a feel within the context of whether, given that you're a national representative, what is the point you're making in that brief? I get it that you know that other people are arguing something else, but what I was listening for was whether you would say that on the argument you're making here, you're embellishing that part in the brief. But I guess what you're telling me, that's to be done by others, and you're going to be dealing principally with the labor peace issue. We were concerned about what the vulnerabilities would be in the likely argument. So, Your Honor, I didn't consider it a trick question. I'm sorry if I made it appear that way to you. With regard to this question you asked about if compelling interest is required, it seems to me that the evidentiary issue is that they cannot show narrow tailoring. It's a problem in Shea. The union was unable to show narrow tailoring. It's a problem here. In fact, by defaulting our client's money into the union's political coffers, they have maximized the risk, not minimized the risk that our client's money would be impermissibly used. Now, with regard to Hansen, you asked whether or not Hansen applied the rational relationship test. Let me just read you a couple of excerpts from Hansen, and you judge. Page 234, the task of the judiciary ends once it appears that the legislative measure adopted is relevant or appropriate to the constitutional power which Congress exercises. The question of whether or not something is relevant or appropriate is clearly a rational relationship test. Or if you look at page 235 of Hansen, it says, to require employees to contribute to the, quote, union costs may not be the wisest course. I see my time is up. Clearly, you could not have anything more than a rational relationship if you said that it might not be the wisest course. Thank you. All right. Thank you, both sides. Able counsel, then.